# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

MICHELLE RZANCA, as Personal Representative for the ESTATE OF JORDAN D. FIELD, DIANE SCHILO, as Personal Representative for the ESTATE OF RICHARD L. SCHILO SR., and WILLIAM HALL, as Personal Representative for the ESTATE OF JANET D. HALL,

Plaintiffs, individually and on behalf of all similarly situated persons,

-vs-

COREWELL HEALTH, a Michigan corporation, and DCM SERVICES, LLC, a Delaware company,

Defendants.

Case No. 26-cv-11692

Hon. Matthew F. Leitman

**AMENDED CLASS ACTION COMPLAINT**

_______________________________________/

Robert J. Buchanan (P42006)
BUCHANAN FIRM
452 Ada Dr. SE, Suite 300
Ada, MI 49301
(616) 458-2464
rjb@buchananfirm.com
CLASS COUNSEL FOR PLAINTIFF CLASS MEMBERS

Michael G. Latiff (P51263)
Mark W. Steiner (P78817)
MCDONALD HOPKINS
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI 48304
(248) 220-1351
mlatiff@mcdonaldhopkins.com
msteiner@mcdonaldhopkins.com
COUNSEL FOR DEFENDANT COREWELL HEALTH

Michael D. Alltmont
SESSIONS, ISRAEL & SHARTLE
3838 N. Causeway Blvd., Suite 2800
Metairie, LA 70002
(504) 828-3700
malltmont@sessions.legal
COUNSEL FOR DEFENDANT DCM SERVICES

Joseph A. Starr (P47253)
Brittany L. Romig (P87734)
STARR BUTLER, PLLC
20700 Civic Center Dr., Ste. 290
Southfield, MI 48076
(248) 554-2700
jstarr@starrbutler.com
bromig@starrbutler.com
LOCAL COUNSEL FOR DEFENDANT DCM SERVICES

/

Plaintiffs, Michelle Rzanca as Personal Representative for the Estate of Jordan D. Field, Diane Schilo as Personal Representative for the Estate of Richard L. Schilo Sr., and William Hall as Personal Representative for the Estate of Janet D. Hall, on behalf of all others similarly situated, through attorneys, Buchanan Firm, state:

## INTRODUCTION

1. This class action arises from Defendants' routine and systematic practice of asserting and, in many cases, collecting medical debts that are not legally owed.

2. After providing medical services to emergency patients, Defendant Corewell Health submits claims for payment to insurers, group health plans, Medicare, or Medicaid and accepts reduced payments under negotiated agreements and governing law as payment in full for covered services. Those agreements and reimbursement rules legally limit and restrict Defendant Corewell Health's recovery

amount to the negotiated or legally permitted rates. After accepting payment, Defendant Corewell Health cannot bill, charge, collect from, seek compensation, remuneration or reimbursement from, or have any recourse against the patient for covered medical services. See, e.g., payment contracts, managed care contracts, Medicare (42 U.S.C. § 1395cc(a)(1)(A)), Medicare Advantage (42 C.F.R. § 422.504(g)(1)(i)), Medicaid (42 C.F.R. § 447.15, 42 C.F.R. § 438.106(b), 42 U.S.C. § 1396a(a)(25)(C), and 42 U.S.C. § 1396u-2(b)(6)), the federal No Surprises Act (45 C.F.R. § 149.410 and 42 U.S.C. § 300gg-111), the Michigan No Surprise Billing Act (Mich. Comp. Laws §§ 333.24501 – 333.24517), the Patient Protection and Affordable Care Act (42 U.S.C. §§ 18001 et seq.), the federal Deficit Reduction Act of 2005 (42 U.S.C. § 1396u-2(b)(2)(D)), etc.

3. Despite accepting those payments and adjustments for covered services, Defendant Corewell Health, in many instances, continues to treat the difference between its "standard charges" (chargemaster rates) or other rates and the lower amounts reimbursed by insurers, Medicare, or Medicaid as an "outstanding balance," and unlawfully seeks to collect that difference from patients, deceased patients' estates, and guarantors.

4. The practice is commonly known as balance billing or surprise billing.

5. These post-payment demands of Defendant Corewell Health are false, misleading, void, and otherwise unlawful to the extent they misrepresent the amount

and legal status of alleged debts or seek recovery of amounts that are not collectible under applicable law, contractual arrangements, or reimbursement limitations. See, e.g., Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust, 410 F.3d 304 (6th Cir. 2005) (hospital's balance billing claim against tort settlement was "prohibited" by state and federal law).

6. The conduct alleged is not isolated but instead reflects a billing and collection practice Defendant Corewell Health facilities use with large numbers of patients. For instance, on information and belief, the practice is often used in circumstances where the patient has died, or in circumstances where a patient or a deceased patient's estate has asserted or may assert a claim against a tortfeasor allegedly responsible for the patient's injuries.

7. On information and belief, Defendant Corewell Health facilities employing this unlawful practice include Corewell Health Beaumont Grosse Pointe Hospital, Corewell Health Dearborn Hospital, Corewell Health Wayne Hospital, Corewell Health Taylor Hospital, Corewell Health Trenton Hospital, Corewell Health Farmington Hills Hospital, Corewell Health in Southeast Michigan, Corewell Health William Beaumont University Hospital, Corewell Health Beaumont Troy Hospital, Corewell Health Big Rapids Hospital, Corewell Health Continuing Care Hospital, Corewell Health Gerber Memorial Hospital, Corewell Health Ludington Hospital, Corewell Health Pennock Hospital, Corewell Health Reed City Hospital,

Corewell Health Grand Rapids Hospitals (Butterworth Hospital, Blodgett Hospital, Helen DeVos Children's Hospital), Corewell Health Lakeland Hospitals (St. Joseph Hospital, Niles Hospital, Watervliet Hospital), and Corewell Health Zeeland Hospital.

8. Defendant Corewell Health routinely refers alleged patient balances to debt collection agencies, including Defendant DCM Services and others, for collection.

9. Defendant DCM Services, acting as a debt collector and working with Defendant Corewell Health, then attempts to collect those alleged balances from patients, deceased patients' estates, and guarantors.

10. Plaintiffs bring this lawsuit to recover money improperly obtained by Defendants from patients, deceased patients' estates, and guarantors through unlawful billing and collection practices, to recover damages under the federal Fair Debt Collection Practices Act and Michigan law, including the Michigan Occupational Code, the Michigan Regulation of Collection Practices Act, and the Michigan Consumer Protection Act, and to obtain declaratory and injunctive relief.

## JURISDICTION AND VENUE

11. This Court has federal question jurisdiction under 28 U.S.C. §1331 because Plaintiffs assert claims under the Fair Debt Collection Practices Act, 15

U.S.C. §1692 et seq. That jurisdiction does not depend on the Class Action Fairness Act.

12. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d). The proposed class exceeds 100 members. Defendant Corewell bills emergency patients at the 19 hospitals listed above, and the aggregate amount in controversy exceeds $5,000,000. Minimal diversity exists: Defendant DCM is a company organized under Delaware law, and so is a citizen of Delaware, 28 U.S.C. §1332(d)(10); Plaintiffs are citizens of Michigan, 28 U.S.C. §1332(c)(2).

13. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367(a). They arise from the same billing statements, collection letters, and calls as the FDCPA claim and form part of the same case or controversy.

14. Venue is proper in this District under 28 U.S.C. §1391 because Defendant Corewell Health conducts business here.

## PARTIES

### PLAINTIFFS

15. Plaintiffs, Michelle Rzanca as appointed Personal Representative for the Estate of Jordan D. Field (the "Field Estate"), Diane Schilo as appointed Personal Representative for the Estate of Richard L. Schilo Sr. (the "Schilo Estate"), and William Hall as appointed Personal Representative for the Estate of Janet D. Hall (the "Hall Estate"), bring this action on behalf of the estates of deceased patients and

other similarly situated patients of Defendant Corewell Health and their guarantors ("Plaintiff class members").

16. Jordan Field, Richard Schilo Sr., and Janet Hall were domiciled in Michigan when they received medical services as emergency patients of Corewell Health. Each has died.

17. Jordan Field, Richard Schilo Sr., and Janet Hall were each a "consumer" as the term is defined by 15 U.S.C. § 1692a(3), M.C.L. § 339.901(1)(f), and M.C.L. § 445.251(1)(d).

**DEFENDANT COREWELL HEALTH**

18. Defendant Corewell Health ("Defendant Corewell") is a Michigan corporation operating hospitals and medical facilities throughout Michigan.

**DEFENDANT DCM SERVICES**

19. Defendant DCM Services LLC ("Defendant DCM") is a Delaware company and a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

## FACTUAL ALLEGATIONS

20. Defendant DCM regularly attempts to collect alleged debts for Defendant Corewell.

21. Defendant Corewell admits that it uses debt collection agencies, including Defendant DCM, to collect unpaid debts, and that Defendant DCM, acting as a debt collector and working with Defendant Corewell, attempts to collect alleged

balances from patients, deceased patients' estates, and guarantors. (ECF No. 12, PageID.62, ¶¶ 8–9). Defendant DCM admits that it attempts to collect balances for Defendant Corewell. (ECF No. 13, PageID.90, ¶ 9).

22. Defendant Corewell participates in agreements with insurers and group health plans and participates in the Medicare and Medicaid reimbursement systems, which establish reimbursement rates for covered medical services.

23. When Defendant Corewell submits claims for reimbursement of medical services, insurers, group health plans, and government payors issue payments at negotiated or statutory rates, and Defendant Corewell applies contractual or government adjustments to reduce billed charges.

24. The adjustments are not temporary reductions to billed charges. They are binding limits that restrict amounts recoverable from patients under applicable agreements and law.

25. Once those payments and adjustments are applied to the billed charges, any financial responsibility of the patient, the patient's estate, or guarantor is satisfied for the covered services.

26. Defendant Corewell admits that payer payments and contractual adjustments limit what it may recover, but contends that this is so "only when the claim is accepted by the third-party payer." (ECF No. 12, PageID.66, ¶¶ 28–30). For emergency services, that qualification does not shift the payer's obligation to the

patient. A payer's request for more information, or a provider's billing error, is not a determination that the patient owes the charges. Payment contracts bar Defendant Corewell from holding members liable for amounts that are the payer's obligation, and Medicare Advantage plans are financially responsible for emergency services regardless of prior authorization. 42 C.F.R. §§ 422.113(b)(2), 422.504(g)(1)(i).

27. Defendant Corewell routinely treats the difference between its standard charges (chargemaster rates) or other rates and lower reimbursement amounts as an "outstanding balance" and seeks to recover that difference directly from patients, deceased patients' estates, and guarantors.

## DEFENDANTS' ACTS TO COLLECT FAKE DEBT

### ESTATE OF JORDAN FIELD
(HEALTH INSURANCE)

28. Defendant Corewell provided emergency medical services to Jordan Field at Corewell Health Butterworth Hospital in Grand Rapids from March 18 to 21, 2024. He arrived by ambulance following a respiratory arrest during a sedation procedure at an oral surgery office and sustained anoxic brain injury. Defendant Corewell admitted him to the intensive care unit, and he died in the hospital from his injuries three days later, on March 21, 2024.

29. Defendant Corewell had a payment contract with Jordan Field's health insurer, Blue Cross Blue Shield PPO (BCBS). The contract set negotiated payment rates for covered medical services, and most were lower than Defendant Corewell's

"standard fees" (or chargemaster rates) for such services. BCBS payment of the contract rates was satisfaction ("payment in full") for the medical services and the patient owed nothing more than his deductible.

30. Under the contract, aside from the insured's deductible, BCBS assumed sole financial liability to Defendant Corewell for payment of covered medical services.

31. The contract prohibited Defendant Corewell from holding a BCBS-insured patient liable for any payment or fees that were the legal obligation of BCBS. Defendant Corewell could not bill, charge, collect from, seek compensation, remuneration or reimbursement from, or have any recourse against an insured patient for a covered medical service.

32. Independent of the payment contract, the federal No Surprises Act requires a group health plan to cover emergency services without prior authorization and "without regard to any other term or condition of such coverage," other than exclusions, coordination of benefits, affiliation or waiting periods, and applicable cost-sharing. 42 U.S.C. § 300gg-111(a)(1). A nonparticipating emergency facility may not bill, and may not hold liable, an insured patient for more than the applicable cost-sharing requirement. 42 U.S.C. § 300gg-131; 45 C.F.R. § 149.410(a). Michigan's surprise-billing law imposes the same prohibition on a nonparticipating provider who treats an emergency patient: the provider "shall not collect or attempt

to collect from the patient any amount other than the applicable in-network coinsurance, copayment, or deductible." M.C.L. § 333.24507(1)(a), (4). If Defendant Corewell contends that its payment contract with BCBS did not govern the facility claim, it was a nonparticipating facility as to that claim, and these statutes applied. Under the contract or, in the alternative, these statutes, the Field Estate owed Defendant Corewell no more than Jordan Field's cost-sharing obligation, regardless of whether BCBS paid the facility account.

33. Following the 2024 hospitalization, Defendant Corewell opened four separate accounts for Jordan Field's admission and billed a combined $65,237.62 for the emergency medical services, as set forth in Paragraph 34 below.

34. The facility account, No. 99149600093, reflects $61,609.62 in charges. BCBS denied that claim, pending additional health history information, and paid Defendant Corewell $0.00 toward it. Defendant Corewell nonetheless posted a $19,448.92 "Contractual Adjustment (Insurance)" to that account, reducing the amount billed to the Estate to $42,160.70. The three remaining accounts cover professional services connected to the same admission: critical care and EEG physician services (Account No. 99149604921: $3,326.00 billed, $1,588.76 paid by BCBS, a $1,290.24 contractual adjustment, and $447.00 billed to the Estate); and two echocardiograms (Account Nos. 99149618364 and 99149703167: a combined $302.00 billed, $118.98 paid by BCBS, $124.25 in contractual adjustments, and

$58.77 billed to the Estate). Across all four accounts, Defendant Corewell billed $65,237.62, BCBS paid $1,707.74, Defendant Corewell applied $20,863.41 in contractual adjustments, and Defendant Corewell billed the Field Estate a combined $42,666.47 (**Exhibit 3** to Complaint ECF No. 1-1, PageID.25-36).

35. BCBS's denial of the facility claim was not a determination that Jordan Field or his estate owed the charges. BCBS asked for additional health history information. On information and belief, Defendant Corewell did not supply it, appeal the denial, or resubmit the claim before billing the Estate. Defendant Corewell's own entries show that it treated the facility claim as governed by its BCBS contract: it posted a $19,448.92 "Contractual Adjustment (Insurance)" to the account. BCBS paid the physician and echocardiogram claims for the same admission.

36. In a letter dated October 30, 2024, and received by the Field Estate, Defendant Corewell falsely represented that the deceased patient owed a "hospital balance" of $42,160.70 and stated, "The balance is your responsibility" (**Exhibit 1** to Complaint ECF No. 1-1, Page ID.19).

37. Defendant Corewell referred the alleged balance of $42,160.70 to Defendant DCM for debt collection from the Field Estate.

38. In a letter dated November 1, 2024, and received by the Field Estate, Defendant DCM identified itself as "a debt collector" and stated it was "trying to collect a debt due from the assets of the estate." Defendant DCM falsely represented

that the deceased patient's estate owed a debt of $42,160.70 to Defendant Corewell (**Exhibit 2** to Complaint ECF No. 1-1, PageID.21-22). An "Itemization of the Debt" listed the $19,448.92 contractual adjustment as "paid or credited toward the debt," though it was not a payment Defendant Corewell received from BCBS.

39. In a statement dated July 22, 2025, and received by the Field Estate, Defendant Corewell listed charges that "Jordan Daniel Field (Guarantor #101930383) is responsible for." The letter itemized the emergency medical services and the insurance payments Defendant Corewell had already received (after "contractual adjustment"), and it falsely represented that the patient's estate owed Defendant Corewell $42,666.47 (**Exhibit 3** to Complaint ECF No. 1-1, PageID.25-36). The debt was fake.

40. In a letter dated October 24, 2025, and received by the Field Estate, Defendant Corewell reminded the Estate of its alleged "outstanding balance" and stated that the debt had been turned over to the "debt collection agency" Defendant DCM for collection (**Exhibit 4** to Complaint ECF No. 1-1, PageID38).

41. On April 7, 2026, Plaintiffs' attorneys called Defendant DCM about the alleged debt. Defendant DCM stated that the Field Estate still owed Defendant Corewell $42,666.47 and would send a debt itemization.

42. In a letter dated April 8, 2026, and received by Plaintiffs' attorneys, Defendant DCM falsely represented that the Field Estate owed a debt of $42,666.47.

The debt collector stated that "we are seeking payment from assets of the decedent's estate" and provided three payment options (**Exhibit 5** to Complaint ECF No. 1-1, PageID40-41).

43. Defendants' communications with the Field Estate since October 2024 have misrepresented the amount, existence, and legal status of the fake debt and demanded payment.

44. Before the Field Estate filed this lawsuit on May 22, 2026, neither Defendant Corewell nor Defendant DCM told the Field Estate or its attorneys that Defendant Corewell had written off any part of the claimed debt or had stopped trying to collect it.

45. Defendants' demands sought payment from the assets of the Field Estate and asserted a $42,666.47 claim against those assets. The Estate spent time and resources investigating and responding to the demands, including through its attorneys.

**ESTATE OF RICHARD SCHILO SR.**
(MEDICARE ADVANTAGE AND ORIGINAL MEDICARE)

46. Richard Schilo Sr. was enrolled in BCN Advantage HMO-POS, a Medicare Advantage plan offered by Blue Care Network of Michigan ("BCN") under Part C of the Medicare program. Defendant Corewell was a contracted, in-network provider for the plan. BCN's February 2026 (**Exhibit 6**) statement lists

Defendant Corewell's Grand Rapids hospitals and its physicians as an "In-Network Provider."

47. Defendant Corewell's contract with BCN prohibited, or was required to prohibit, Defendant Corewell from holding Richard Schilo Sr. liable for any fees that were BCN's legal obligation. 42 C.F.R. § 422.504(g)(1)(i).

48. Federal law also limits what a Medicare Advantage enrollee pays for emergency services. The plan is financially responsible for emergency services regardless of prior authorization and "regardless of final diagnosis." 42 C.F.R. § 422.113(b)(2)(ii), (iii). The enrollee's cost-sharing for each emergency visit may not exceed the lower of the plan's emergency cost-sharing or a fixed dollar limit. Id. § 422.113(b)(2)(v). For 2025, the highest permitted limit under federal law was $140.00 per visit. Id. § 422.113(b)(2)(v)(B)(3).

49. On September 13, 2025, Defendant Corewell treated Richard Schilo Sr. in the emergency department of Corewell Health Butterworth Hospital in Grand Rapids. Defendant Corewell opened Account No. 99161474458 and billed $798.00: $637.00 for an emergency department visit and $161.00 for insertion of a bladder catheter. Richard Schilo Sr. paid a $125.00 copayment for the visit (**Exhibit 6**, Page 8).

50. On September 21, 2025, Defendant Corewell again treated Richard Schilo Sr. in the emergency department of Corewell Health Butterworth Hospital.

Defendant Corewell opened Account No. 99161641925 and billed $1,004.73: $637.00 for an emergency department visit, $161.00 for insertion of a bladder catheter, $50.00 for a urine culture, $17.00 for a urinalysis, and $139.73 for supplies. Richard Schilo Sr. paid a $125.00 copayment for the visit (**Exhibit 6**, Page 9).

51. BCN's February 2026 statement listed both claims, showed Richard Schilo Sr.'s share of each as $0.00, and stated: "you are not responsible for paying the billed amount because you received this service from a Medicare Advantage HMO/HMO-POS provider." BCN stated that "[a] claim from your provider showing Medicare payment needs to be submitted for payment consideration" (**Exhibit 6**).

52. Richard Schilo Sr. paid his cost-sharing for both emergency visits. Under his plan and federal law, he owed nothing more.

53. Richard Schilo Sr. died on November 17, 2025.

54. Defendant Corewell knew Richard Schilo Sr. had died. In a letter dated November 19, 2025, it told the Estate that it had "recently learned of Richard Schilo Sr.'s passing" and that "you or your family may receive communication from DCM Services, LLC within the next thirty (30) days regarding any outstanding balance on the account" (**Exhibit 7**).

55. On February 16, 2026, Defendant Corewell sent letters about both emergency visits, addressed to Richard Schilo Sr. at his home. The letter for the September 13 visit stated an "Account Balance" of $798.00 and a "Hospital

Balance" of $673.00. The letter for the September 21 visit stated an "Account Balance" of $1,004.73 and a "Hospital Balance" of $879.73. Each letter stated that his insurer denied the claim "since they are looking for updated coordination of benefit information" and warned: "Unfortunately, the current outstanding claims will become your responsibility if you do not update this information with your insurance" (**Exhibit 8**).

56. The letters were false. Each "Hospital Balance" equals the billed charges less the $125.00 copayment Richard Schilo Sr. paid. Each exceeded the most federal law permits a Medicare Advantage enrollee to pay for an emergency visit. The unpaid charges were BCN's obligation. Neither Richard Schilo Sr. nor his estate owed any part of either balance. The debts were fake.

57. On October 13, 2025, Defendant Corewell treated Richard Schilo Sr. in the emergency department of Corewell Health Butterworth Hospital and kept him in observation until October 15, 2025. Defendant Corewell billed $12,555.69 for the facility services, including $1,696.00 for an emergency department visit with a high level of medical decision making (**Exhibit 6**, Pages 10-12).

58. Medicare's records show that Original Medicare paid Spectrum Health Continuing Care for hospice care to Richard Schilo Sr. from October 9 to 13 and from October 15 to 31, 2025 (**Exhibit 9**). On information and belief, Richard Schilo Sr. had elected the Medicare hospice benefit. When a Medicare Advantage enrollee

elects hospice, Original Medicare pays for hospice care and for other Medicare-covered services. 42 C.F.R. § 422.320(c)(3). An enrollee who follows plan rules pays only plan cost-sharing for covered non-hospice services, and "[t]he [Medicare Advantage] plan must pay the provider the difference between original Medicare cost-sharing and plan cost-sharing." Medicare Managed Care Manual, ch. 4, § 10.4, Table I, n. 2 (Rev. 121, Apr. 22, 2016).

59. Original Medicare paid Defendant Corewell $2,033.84 for the emergency department visit and listed $518.84 as the coinsurance (**Exhibit 9**, Page 6). BCN listed Richard Schilo Sr.'s share of the facility claim as $0.00 and stated that he was "not responsible for paying the billed amount" (**Exhibit 6**, Page 12).

60. On information and belief, Richard Schilo Sr. followed his plan's rules by receiving care from an in-network provider, and he paid a $125.00 copayment for the October 13 visit, as he did for his September visits. That payment satisfied his plan cost-sharing. BCN, not Richard Schilo Sr., was responsible for the difference between the Original Medicare coinsurance and his plan cost-sharing.

61. Defendant Corewell referred a claimed balance of $393.84 for the October 13 visit to Defendant DCM for collection from the Schilo Estate. That amount equals the $518.84 Original Medicare coinsurance less $125.00. In a letter dated March 4, 2026, Defendant DCM stated that it "is a debt collector" and was "trying to collect a debt due from the assets of the estate." Defendant DCM falsely

represented that "RICHARD LEWIS SCHILO had a Corewell Health debt" and that the "[t]otal amount of the debt now" was $393.84. Its "Itemization of the Debt" stated that $12,555.69 was owed "[a]s of October 13, 2025" and that $12,161.85 had been "paid or credited toward the debt" (**Exhibit 10**).

62. In a March 2026 call with Diane Schilo, Defendant DCM represented that the Schilo Estate owed the debts.

63. On March 27, 2026, in response to Defendant DCM's demands, $600.00 was paid on behalf of the Schilo Estate to resolve the balances Defendant DCM claimed on two accounts. Of that amount, $297.35 was applied to the balance claimed for the October 13 visit. That money was not owed.

64. The Schilo Estate's payments were not made with full knowledge of the facts. It paid because Defendants represented that the balances were owed. It did not know that the balances consisted of amounts BCN owed, or that Defendant Corewell had not billed BCN for the difference between the Original Medicare coinsurance and Richard Schilo Sr.'s plan cost-sharing. The payments were not a compromise of a disputed claim.

65. Defendant Corewell also referred to Defendant DCM claimed balances for non-emergency services provided between May and August 2025. BCN listed Richard Schilo Sr.'s share of each claim as $0.00 and stated that he was "not responsible for paying the billed amount" (**Exhibit 6**). Original Medicare denied the

claims it received for those services because "our records show that you were in a Medicare health plan on this date. Your provider must bill this service to the Medicare health plan." It listed $0.00 as the most Richard Schilo Sr. could be billed (**Exhibit 11**).

66. In a letter dated January 9, 2026, Defendant DCM demanded $35.00 for urodynamic testing performed on May 6, 2025 (Reference No. 93709856). Its "Itemization of the Debt" stated that $1,942.00 was owed "[a]s of May 6 2025" and that $1,907.00 had been "paid or credited toward the debt" (**Exhibit 12**).

67. After sending the letter, Defendant DCM represented in a call with Diane Schilo that the Schilo Estate owed the $35.00.

68. On January 19, 2026, $35.00 was paid by check on behalf of the Schilo Estate. On March 16, 2026, Defendant DCM returned the check and stated that the "Account is no longer handled by our office" (**Exhibit 13**).

69. In a letter dated April 3, 2026, Defendant DCM demanded $1,565.56 for four other accounts (**Exhibit 14**). In a letter dated April 17, 2026, Defendant DCM stated an "Unpaid Balance" of $1,368.00 on the May 6, 2025 account, the account it had said it no longer handled (**Exhibit 15**).

70. In a letter dated April 27, 2026, Defendant DCM acknowledged a "recent payment of $70.74 made on 04/20/26" on behalf of the Schilo Estate, applied all of it to the May 6, 2025 account, and demanded a "Total Unpaid Balance" of

$2,862.82: $1,297.26 for the May 6 services and $1,565.56 for the four other accounts. The same letter stated: "We will distribute partial payments evenly across all remaining balances unless otherwise directed" (**Exhibit 16**).

71. Neither Richard Schilo Sr. nor his estate owed any of the $2,862.82. The debts were fake.

72. Defendants' communications with the Schilo Estate misrepresented the amount, existence, and legal status of the fake debts and demanded payment.

**ESTATE OF JANET HALL**
(MEDICARE ADVANTAGE AND ORIGINAL MEDICARE)

73. Defendant Corewell provided emergency medical services to Janet Hall at Corewell Health Blodgett Hospital in Grand Rapids from December 24 to 27, 2023. She was treated in the emergency department and admitted to the hospital.

74. Janet Hall was enrolled in an Aetna Medicare Advantage plan, "Medicare (P01) ESA PPO," offered under Part C of the Medicare program. Defendant Corewell was a contracted, in-network provider for the plan. Aetna processed her claims "at the contracted rate for your provider" (**Exhibit 17**, page 14 of 15).

75. Federal law requires every Medicare Advantage organization to protect its enrollees from liability for fees that are the organization's legal obligation. Its contracts with providers must "prohibit the organization's providers from holding any enrollee liable for payment of any such fees." 42 C.F.R. § 422.504(g)(1)(i); see

also 42 C.F.R. § 422.504(i)(3)(i). Defendant Corewell's contract with Aetna contained, or was required to contain, that prohibition. Defendant Corewell could not bill or collect from Janet Hall, or her estate, any amount that was Aetna's obligation.

76. Janet Hall's plan limited her yearly out-of-pocket costs for covered services to $2,500.00, combining in-network and out-of-network services. By December 31, 2023, she had reached that limit for 2023. Aetna's statements told her that once the limit is reached, "you stop paying out of pocket for all services" and "the plan will pay the full cost for the rest of the year." The February 7, 2024 Aetna statement showed the 2023 limit as met (**Exhibit 17**, Page 3 of 15).

77. Defendant Corewell opened Account No. 99147932845 for physician services connected to Janet Hall's admission and billed $1,132.00 for five charges: an initial hospital visit on December 24, 2023 ($410.00); subsequent hospital visits on December 25 and 26, 2023 ($217.00 each); prolonged services on December 25, 2023 ($59.00); and a discharge visit on December 27, 2023 ($229.00) (**Exhibit 18**).

78. Aetna paid the charges at the contracted rates, and Defendant Corewell applied contractual adjustments under its contract with Aetna. By January 18, 2024, the account balance was $0.00. Aetna's statement dated February 7, 2024 showed Janet Hall's share of each charge as $0.00 (**Exhibit 17**).

79. Janet Hall elected the Medicare hospice benefit. When a Medicare Advantage enrollee elects hospice, Original Medicare pays for hospice care and for other Medicare-covered services, and hospice coverage is effective on the date of election. 42 C.F.R. § 422.320(c)(3); Medicare Managed Care Manual, ch. 4, § 10.4 (Rev. 121, Apr. 22, 2016). An enrollee who follows plan rules pays only her plan cost-sharing for covered non-hospice services, and "[t]he [Medicare Advantage] plan must pay the provider the difference between original Medicare cost-sharing and plan cost-sharing." Id., § 10.4, Table I, n. 2.

80. In May 2024, Aetna reversed its $113.14 payment for the December 27, 2023 discharge visit and denied the resubmitted claim, stating: "We've asked your provider to send this to Medicare. Charges for members electing hospice are considered by Medicare." Aetna told Janet Hall that "you are not responsible for paying the billed amount" (**Exhibit 19**, Page 9 of 9). On May 13, 2024, Defendant Corewell posted Aetna's reversal of the payment, the contractual adjustment, and the sequestration adjustment, which restored $229.00 to the account (**Exhibit 18**, Page 2).

81. On information and belief, Defendant Corewell then billed Original Medicare for the discharge visit. On May 31, 2024, Defendant Corewell posted a payment of $87.88, a contractual adjustment of $116.91, and a sequestration adjustment of $1.79, with the notation "Coinsurance: [$]22.42" (**Exhibit 18**, Page

2). Those figures match an Original Medicare payment of 80 percent of a $112.09 allowed amount, less a two percent sequestration reduction. They left a balance of $22.42.

82. Janet Hall followed her plan's rules by receiving care from an in-network provider, and she had met her 2023 out-of-pocket limit. Her plan cost-sharing for the discharge visit was $0.00. Aetna, not Janet Hall, was responsible for the $22.42 difference between Original Medicare cost-sharing and her plan cost-sharing.

83. On July 17, 2024, Defendant Corewell reversed Aetna's January 18, 2024 payment, contractual adjustment, and sequestration adjustment a second time, posting $113.14, $113.55, and $2.31 back to the account. Aetna had recouped its payment only once. Aetna's statements for claims processed in June, July, and October 2024 show no further action on the discharge-visit claim. The July 17, 2024 entries had no payer action behind them. They restored $229.00, including the $113.55 contractual write-off, to the account (**Exhibit 18**).

84. Those entries produced a balance of $251.42: $229.00 from Defendant Corewell's duplicate reversal and $22.42 in cost-sharing that was Aetna's obligation. Janet Hall and her estate owed none of it.

85. Janet Hall died. Defendant Corewell referred the alleged balance of $251.42 to Defendant DCM for debt collection from the Hall Estate.

86. In a letter dated February 7, 2025, addressed to "The Estate of JANET HALL," Defendant DCM stated that it was "trying to identify and locate the person who is authorized to act on behalf of JANET HALL's Estate" (**Exhibit 20**).

87. In a letter dated February 18, 2025, Defendant DCM stated that it "is a debt collector" and was "trying to collect a debt due from the assets of the estate." Defendant DCM falsely represented that "JANET HALL had a Corewell Health debt" and that the "[t]otal amount of the debt now" was $251.42. An "Itemization of the Debt" stated that $1,132.00 was owed "[a]s of December 24 2023" and that $880.58 had been "paid or credited toward the debt." The itemization concealed that the account balance was $0.00 on January 18, 2024, and that the $251.42 arose only from Defendant Corewell's later entries (**Exhibit 21**).

88. In a letter dated March 13, 2025, Defendant DCM again represented an "Unpaid Balance" of $251.42 and enclosed a Defendant Corewell statement listing "services Janet Hall (Guarantor #101710176) Is responsible for." The statement reported $880.58 in "Insurance Payments" and $0.00 in "Adjustments." In fact, insurance payments net of reversals totaled $412.87. The remaining $467.71 consisted of contractual and sequestration adjustments (**Exhibit 22**).

89. In calls with William Hall, Defendant DCM represented that the Hall Estate owed the debt.

90. Defendants' communications with the Hall Estate misrepresented the amount, existence, and legal status of the fake debt and demanded payment.

## OTHER SIMILARLY SITUATED PATIENTS

91. Defendant Corewell engages in similar billing and collection practices against other patients, deceased patients' estates, and guarantors.

92. Upon information and belief, Defendant Corewell routinely refers fake balance billing debts to debt collectors, including Defendant DCM and United Collection Bureau, Inc., to demand money from patients, deceased patients' estates, and guarantors.

93. The unlawful practice affects large numbers of patients, deceased patients' estates, and guarantors subjected to collection demands for amounts not legally owed, and many pay money to Defendants based on the belief that payment is legally required.

94. As a result of Defendants' conduct, Plaintiffs and Plaintiff class members have been misled regarding their legal obligations, exposed to collection pressures, and in many instances paid money to Defendants not legally owed.

95. Plaintiffs and Plaintiff class members suffered concrete injuries. Class members paid money they did not owe. The Schilo Estate paid $600.00 on March 27, 2026 and $70.74 on April 20, 2026 in response to Defendants' demands, and Defendant DCM held its $35.00 check for nearly two months before returning it.

Defendants asserted claims against the assets of the Field, Schilo, and Hall Estates, and each Estate spent time and resources responding to them.

## CLASS ACTION ALLEGATIONS

97. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as: All emergency patients, deceased emergency patients' estates, or guarantors who, within the applicable limitations period, were billed or subjected to collection efforts by Defendants for amounts exceeding those permitted after payment by insurers, group health plans, Medicare, or Medicaid.

98. The class is so numerous that joinder of all members is impracticable.

99. Questions of law and fact common to the class regarding Defendants' routine unlawful conduct predominate over any questions affecting only individual members. Defendants used uniform billing rules, standard statements, and form collection letters and itemizations. A class action is superior to other available methods to adjudicate the controversy.

100. Plaintiffs' claims are typical of the claims of the class because they arise from the same routine practice.

101. Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are consistent with, and not antagonistic to, those of other class members. Plaintiffs seek to represent a class of individuals harmed by the

same conduct that harmed the Field Estate, the Schilo Estate, and the Hall Estate. Vindication of the Field Estate's, the Schilo Estate's, and the Hall Estate's claims will also be vindication of the other class members' claims.

102. Plaintiffs have retained attorneys who will provide adequate representation. Plaintiffs' attorneys are experienced in complex litigation and consumer issues.

## CLAIMS FOR RELIEF

## COUNT I
## UNJUST ENRICHMENT

103. Plaintiffs reallege and incorporate by reference each of the allegations above.

104. Defendants have unjustly received and retained money of Plaintiff class members through the assertion and collection of medical charges that were fake, invalid, and not legally owed.

105. Plaintiff class members, including the Schilo Estate, conferred a benefit on Defendants by paying amounts Defendants demanded.

106. Count I is pleaded in the alternative to Count VIII. Fed. R. Civ. P. 8(d)(2)–(3). No express contract between Plaintiffs or Plaintiff class members and Defendant DCM governs the money Defendant DCM collected. Defendant Corewell asserts that "there is no valid underlying contract." (ECF No. 12, PageID.83,

Affirmative Defense 12). To the extent no enforceable contract governs the amounts Defendants collected, Plaintiffs and Plaintiff class members may recover them in unjust enrichment.

107. The money taken belonged to Plaintiff class members.

108. Defendants' retention of the money is unjust and inequitable.

109. Defendants should not be permitted to retain money obtained through the assertion or collection of fake and invalid debts.

110. As a result of Defendants' unlawful conduct, Plaintiff class members have suffered damages, including the payment of money not owed and other financial harms.

**COUNT II**
**STATUTORY CONVERSION (MICH. COMP. LAWS § 600.2919a)**

111. Plaintiffs reallege and incorporate by reference each of the allegations above.

112. Defendants have wrongfully exerted dominion and control over money belonging to Plaintiff class members in denial of or inconsistent with their rights.

113. By collecting and taking money not legally owed, Defendants interfered with Plaintiff class members' rights to possess and control their own money.

114. Defendants converted the money for their own use.

115. Defendants' conduct of taking the money from Plaintiff class members was intentional and without lawful justification.

116. The funds obtained by Defendants were specific, identifiable monies derived from payments made in response to Defendants' billing and collection efforts. They are identified by payer, date, and amount, including the Schilo Estate's $600.00 payment on March 27, 2026 and its $70.74 payment on April 20, 2026. Defendants were obligated to return those specific funds.

117. Defendants' retention of those funds constitutes conversion under applicable law.

118. Plaintiff class members are entitled to return of the money and treble damages (three times the amount of money taken). Mich. Comp. Laws § 600.2919a.

119. Plaintiff class members are entitled to attorney fees and costs. M.C.L. § 600.2919a.

## COUNT III
## FRAUD IN THE INDUCEMENT

120. Plaintiffs reallege and incorporate by reference each of the allegations above.

121. Defendants made material representations to Plaintiff class members that certain medical charges were due and owing to Defendant Corewell.

123. The representations were false.

124. When Defendants made the representations, Defendants knew they were false, or made them recklessly without knowledge of their truth and as positive assertions.

125. Defendants made the representations with the intention that Plaintiff class members would act upon them.

126. Plaintiff class members acted in reliance upon the representations by paying money to Defendants. The Schilo Estate, for instance, paid $600.00 on March 27, 2026 and $70.74 on April 20, 2026 in reliance on Defendant DCM's demands.

127. As a result, Plaintiff class members suffered damages, including the payment of money not owed and other related financial harms.

## COUNT IV
## FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
## (AGAINST DEFENDANT DCM)

128. Plaintiffs reallege and incorporate by reference each of the allegations above.

129. Defendant DCM Services is a "debt collector" as defined by 15 U.S.C. § 1692a(6) of the Fair Debt Collection Practices Act (FDCPA).

130. The FDCPA states that "a debt collector may not use any false, deceptive, or misleading representations or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

131. The alleged debts at issue are "consumer debts" within the meaning of 15 U.S.C. § 1692a(5), as they arise from transactions primarily for personal, family, or household purposes.

132. Defendant DCM used interstate commerce and the mails in its business of collecting debts on behalf of others.

133. Defendant DCM represented to Plaintiff class members that they owed certain amounts to Defendant Corewell Health, including in written communications identifying the billing balances reflecting the patients' debt.

134. Those representations were false, deceptive, or misleading in violation of 15 U.S.C. § 1692e because they misstated the existence, amount, and legal status of Plaintiff class members' alleged debts.

135. Defendant DCM used unfair or unconscionable means to attempt to collect debts from Plaintiff class members in violation of 15 U.S.C. § 1692f by seeking to collect amounts not permitted by law.

136. Each false, deceptive, or misleading communication is a separate violation.

137. Defendant DCM's violations did not result from bona fide errors. 15 U.S.C. § 1692k(c). It did not maintain procedures reasonably adapted to avoid them. A mistake about what the law permitted Defendant DCM to collect is not a bona fide error.

138. As to the Hall Estate, no person had authority to sue on the Estate's behalf when Defendant DCM sent its letters or for more than one year afterward, and Defendant DCM's own letter acknowledged that it did not know who was authorized to act for the Estate. The limitations period of 15 U.S.C. § 1692k(d) should be equitably tolled for the Hall Estate's claim.

139. As a result of these violations, Plaintiffs and Plaintiff class members have suffered damages, including the money the Schilo Estate paid in response to Defendant DCM's demands. Statutory damages do not require proof of actual damages.

140. Plaintiffs and Plaintiff class members are entitled to actual damages. Each Plaintiff is entitled to statutory damages of up to $1,000, and the class to statutory damages of up to the lesser of $500,000 or 1 percent of Defendant DCM's net worth. 15 U.S.C. § 1692k(a)(1), (2)(A)–(B).

141. Plaintiff class members are also entitled to attorney's fees and costs. 15 U.S.C. § 1692k(a)(3).

## COUNT V
## MICHIGAN FAIR DEBT COLLECTION PRACTICES ACT (MICH. COMP. LAWS §§ 339.901 et seq.)

142. Plaintiffs reallege and incorporate by reference each of the allegations above.

143. Defendant DCM is a "collection agency" as defined by M.C.L. § 339.901(1)(b).

144. Michigan law states that a collection agency "shall not commit one or more of the following acts: (a) communicating with a debtor in a misleading or deceptive manner …" or "(e) making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt …." M.C.L. §§ 339.915(a) and (e).

145. The alleged debts at issue, within the meaning of M.C.L. § 339.901(1)(a), arise from transactions made primarily for personal, family, or household purposes.

146. Defendant DCM represented to Plaintiffs and Plaintiff class members that they owed certain amounts to Defendant Corewell, including in written communications identifying the billing balances reflecting the patients' debts.

147. Those representations were false, deceptive, or misleading in violation of M.C.L. §§ 339.915(a) and (e) because they misstated the existence, amount, and legal status of Plaintiff class members' alleged debts.

148. No statute, regulation, or agency authorization permits Defendant DCM to misrepresent the amount or legal status of medical debts or to collect amounts not legally recoverable.

149. Defendant DCM used unfair or unconscionable means to attempt to collect debts from Plaintiff class members in violation of M.C.L. §§ 339.901 et seq. by seeking to collect amounts not permitted by law.

150. As a result of these violations, Plaintiff class members have suffered damages and are entitled to actual damages, statutory damages, declaratory and injunctive relief, attorney's fees and costs, and other relief. M.C.L. § 339.916(2).

## COUNT VI
## MICHIGAN REGULATION OF COLLECTION PRACTICES ACT (MICH. COMP. LAWS §§ 445.251 et seq.)

151. Plaintiffs reallege and incorporate by reference each of the allegations above.

152. Defendant Corewell is a "regulated person" under M.C.L. § 445.251(1)(g). It collects its own patient accounts, and its collection activities are confined to and directly related to its business of providing hospital and medical services, not the business of a collection agency.

153. Defendant Corewell is a "creditor" under M.C.L. § 445.251(1)(e). The alleged balances are asserted to be owed to it. Defendant Corewell remained the creditor when it referred accounts to Defendant DCM and other agencies for collection.

154. The alleged balances are "claims" or "debts" under M.C.L. § 445.251(1)(a). Each arises from an express or implied agreement for medical services purchased primarily for personal, family, or household purposes.

155. Jordan Field, Richard Schilo Sr., Janet Hall, and Plaintiff class members are "consumers" or "debtors" under M.C.L. § 445.251(1)(d). Plaintiffs and Plaintiff class members are "persons" under M.C.L. § 445.251(1)(f).

156. Defendant Corewell communicated with Plaintiffs and Plaintiff class members in a misleading or deceptive manner. Its statements, letters, and calls told them they owed balances that payment contracts, Medicare and Medicaid rules, Medicare Advantage rules, the No Surprises Act, Michigan's surprise-billing law, and other laws barred Defendant Corewell from collecting. M.C.L. § 445.252(a).

157. Defendant Corewell made inaccurate, misleading, untrue, or deceptive statements and claims in communications to collect debts. M.C.L. § 445.252(e).

158. Defendant Corewell misrepresented the legal rights of the creditor and the debtor. It represented that it had the right to collect, and that patients, estates, and guarantors were obligated to pay, amounts that its payment contracts and the law barred it from collecting. M.C.L. § 445.252(f)(ii).

159. Defendant Corewell made these representations directly and through Defendant DCM, which it engaged to collect the balances Defendant Corewell claimed. Defendant DCM's letters identified Defendant Corewell as the creditor,

demanded the balances Defendant Corewell reported, and enclosed Defendant Corewell's statements. Defendant Corewell is responsible for the representations it made through its agent.

160. Defendant Corewell failed to implement a procedure designed to prevent violations by its employees. M.C.L. § 445.252(q). Its employees posted account entries, issued statements, and referred accounts for collection that billed patients and estates for amounts that payers owed or that Defendant Corewell had agreed to accept as payment in full.

161. Defendant Corewell's violations were willful. It knew the terms of its payment contracts and the federal and state limits on what it could bill emergency patients.

162. Plaintiffs and Plaintiff class members suffered injury, loss, or damage, and money was collected from Plaintiff class members, by the use of these methods, acts, and practices. M.C.L. § 445.257(1).

163. Plaintiffs and Plaintiff class members are entitled to actual damages or $50.00, whichever is greater, and to equitable relief, including an injunction. Because the violations were willful, the Court may assess a civil fine of not less than three times actual damages or $150.00, whichever is greater, and must award reasonable attorney's fees and court costs. M.C.L. § 445.257(1), (2).

## COUNT VII

## MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS §§ 445.901 et seq.)

164. Plaintiffs reallege and incorporate by reference each of the allegations above.

165. The Michigan Consumer Protection Act ("MCPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L. § 445.903(1).

166. Defendant Corewell conducts a business providing medical services primarily for personal, family, or household purposes. Billing patients for those services, and collecting those bills through Defendant DCM and other agencies, is part of that business. The conduct is "trade or commerce" under M.C.L. § 445.902(1)(g).

167. The conduct challenged here involves the commercial side of Defendant Corewell's business: what it bills, what it tells patients they owe, and how it collects. It does not involve medical judgment or the quality of medical care.

168. Each Plaintiff and each Plaintiff class member is a "person" under M.C.L. § 445.902(1)(d).

169. Defendants, in the course of trade or commerce, represented to Plaintiffs and Plaintiff class members that certain balances remained legally due and

owing after insurance payments, contractual adjustments, Medicare or Medicaid reimbursements, or other reimbursement limitations had already been applied.

170. Defendants represented in billing statements, letters, collection notices, calls, and related communications that Plaintiffs and Plaintiff class members owed specific amounts allegedly due to Defendant Corewell.

171. Defendants represented that Plaintiffs and Plaintiff class members were legally obligated to pay those balances and that Defendants were entitled to collect them.

172. Those representations were false, misleading, deceptive, or unfair because the balances sought exceeded amounts permitted or collectible under applicable reimbursement limitations, contractual arrangements, governing law, or applicable emergency-services billing protections.

173. Defendants caused a probability of confusion or of misunderstanding as to the legal rights and obligations of patients, deceased patients' estates, and guarantors. Defendants told them they owed balances that payment contracts, Medicare or Medical rules, Medicare Advantage rules, the No Surprises Act, Michigan's surprise-billing law, or other laws barred Defendants from collecting. M.C.L. § 445.903(1)(n).

174. Defendants failed to reveal material facts that patients, estates, and guarantors could not reasonably know: the terms of Defendant Corewell's payment

contracts, the payer's responsibility for the amounts billed, and the account entries that produced the alleged balances. The omissions tend to mislead and deceive. M.C.L. § 445.903(1)(s).

175. Defendants failed to provide the promised benefits of the transaction. Payment contracts, Medicare and Medicaid rules, Medicare Advantage rules, and federal and state surprise-billing laws promised patients that they would owe no more than their cost-sharing obligation for covered services. Defendants billed and collected more. M.C.L. § 445.903(1)(y).

176. Defendants charged patients, estates, and guarantors prices in excess of the price at which similar services are sold. Defendants sought Defendant Corewell's excess charges rather than the negotiated or statutory rates Defendant Corewell agreed to accept for the same services. M.C.L. § 445.903(1)(z).

177. Defendants made representations of fact material to the transaction—the existence, amount, and legal status of the alleged debts—such that a person would reasonably believe the state of affairs to be other than it actually is. M.C.L. § 445.903(1)(bb).

178. Defendants failed to reveal facts material to the transaction in light of the positive representations of fact they made. Defendant DCM's letters and calls to the Field Estate stated that the Estate owed a debt for medical services without disclosing that it owed nothing under Defendant Corewell's payment contract with

BCBS. Defendant DCM's letters and calls to the Hall Estate stated that the Estate owed a debt of $251.42 without disclosing that the account balance was $0.00 on January 18, 2024, and that the Estate owed nothing. Defendant Corewell's letters and calls to the Schilo Estate stated balances of $673.00 and $879.73 for emergency visits without disclosing that Richard Schilo Sr. had paid his cost-sharing and that the remaining charges were BCN's obligation. Defendant DCM's letters and calls to the Schilo Estate demanded payment without disclosing that BCN reported Richard Schilo Sr.'s share as $0.00. M.C.L. § 445.903(1)(cc).

179. The exemption in M.C.L. § 445.904(1)(a) does not apply. It reaches only a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States."

180. No statute, regulation, or agency authorization permits Defendants to misrepresent the amount or legal status of medical debts or to collect amounts not legally recoverable. Defendant Corewell's hospital licensure, and any license Defendant DCM holds as a collection agency, do not authorize that conduct. The laws that govern it—Defendant Corewell's payment contracts, Medicare and Medicaid rules, Medicare Advantage rules, the No Surprises Act, Michigan's surprise-billing law, and M.C.L. § 339.915—prohibit it.

181. Defendants failed to disclose material limitations on their legal ability to collect the alleged balances.

182. Defendants' actions and communications have misled or deceived Plaintiffs and Plaintiff class members.

183. Upon information and belief, Defendants engaged in the same practices with other patients, deceased patients' estates, and guarantors, and did not maintain procedures reasonably adopted to prevent billing and collecting amounts not owed. Defendants' conduct on the Field, Schilo, and Hall accounts shows the absence of such procedures.

184. Plaintiffs and Plaintiff class members suffered loss. Class members who paid amounts not owed lost that money. Plaintiffs and Plaintiff class members who did not pay lost the protection from excess billing they were promised and reasonably expected, had collection demands made against them and their estates, and spent time and resources responding to those demands.

185. Plaintiffs and Plaintiff class members have suffered damages and are entitled to actual damages, statutory damages, declaratory and injunctive relief, attorney's fees and costs, and other relief. M.C.L. § 445.911(2), (5).

186. Plaintiffs and Plaintiff class members are entitled to a declaratory judgment that Defendants' practices are unlawful under M.C.L. § 445.903. M.C.L. § 445.911(1)(a). Defendants are engaging in these practices and, unless restrained,

will continue to do so. Plaintiffs are entitled to an injunction against them. M.C.L. § 445.911(1)(b).

**COUNT VIII – THIRD-PARTY BENEFICIARY BREACH**

187. Plaintiffs reallege and incorporate by reference each of the allegations above.

188. Defendant Corewell participates in agreements with insurers or group health plans (e.g., payment contracts, managed care contracts) and participates in the Medicare and Medicaid reimbursement systems that establish fixed, reduced payment rates for medical services.

189. When Defendant Corewell submits claims for reimbursement, insurers, group health plans, or government payors issue payment at those negotiated or statutory rates and Defendant Corewell applies contractual adjustments to reduce standard charges.

190. These adjustments are not temporary reductions. They reflect binding limitations on what the provider may collect for the services rendered.

191. Once those payments and adjustments are applied, the patient's financial obligation is satisfied in full. See, e.g., payment contracts, managed care contracts, Medicare (42 U.S.C. § 1395cc(a)(1)(A)), Medicare Advantage (42 C.F.R. § 422.504(g)(1)(i)), Medicaid (42 C.F.R. § 447.15, 42 C.F.R. § 438.106(b), 42 U.S.C. § 1396a(a)(25)(C), and 42 U.S.C. § 1396u-2(b)(6)), the federal No Surprises

Act (45 C.F.R. § 149.410 and 42 U.S.C. § 300gg-111), the Michigan No Surprise Billing Act (Mich. Comp. Laws §§ 333.24501 to 333.24517), the Patient Protection and Affordable Care Act (42 U.S.C. § 18001 et seq.), the federal Deficit Reduction Act of 2005 (42 U.S.C. § 1396u-2(b)(2)(D)), etc.

192. Plaintiff class members are intended beneficiaries of those agreements and protections, as they define and limit the amounts for which patients may be held financially responsible.

193. The payment contracts do more than incidentally benefit patients. Each contains Defendant Corewell's promise not to bill or hold liable the payer's members for amounts that are the payer's obligation. Federal regulations require every Medicare Advantage provider contract to contain that promise for the enrollees' protection. 42 C.F.R. § 422.504(g)(1)(i). The promise runs directly to a reasonably identified class, the payer's members, and makes them intended beneficiaries. M.C.L. § 600.1405(1).

194. By seeking to collect amounts in excess of those permitted under such agreements and protections, Defendant Corewell breached them.

195. As a result of that breach, Plaintiff class members have suffered damages.

## COUNT IX – CONCERT OF ACTION

196. Plaintiffs reallege and incorporate by reference each of the allegations above.

197. Defendants, by concerted action, took money of Plaintiff class members by unlawful means.

198. Defendants acted jointly, toward a common purpose to get money from Plaintiff class members that was and is not owed.

199. Defendants agreed to collect the alleged balances together. Defendant Corewell admits that it uses Defendant DCM to collect unpaid debts. Each Defendant acted tortiously.

200. As a result of Defendants' unlawful acts, Plaintiff class members have suffered damages.

201. Defendants are jointly and severally liable to Plaintiff class members for damages.

## COUNT X – DECLARATORY AND INJUNCTIVE RELIEF

202. Plaintiffs reallege and incorporate by reference each of the allegations above.

203. An actual controversy exists between the parties regarding whether Defendants may lawfully assert and collect the charges at issue.

204. Plaintiffs contend that such charges are not legally owed and Defendants' billing and collection practices are unlawful.

205. Defendants contend, or have acted as though, such charges are valid and collectible.

206. A judicial declaration is necessary to determine the rights and obligations of the parties.

207. Plaintiffs also seek injunctive relief prohibiting Defendants from continuing to assert and collect amounts not legally owed.

208. Defendants are engaging in these practices and, unless restrained, will continue to do so. Absent such relief, Plaintiff class members will continue to suffer harm.

**PRAYER FOR RELIEF**

ACCORDINGLY, Plaintiff class members request this Court:

a. Certify the class;

b. Award restitution to Plaintiff class members and disgorgement of money Defendants have taken, including treble statutory damages (three times the amount of money taken). See, e.g., M.C.L. § 600.2919a;

c. Award statutory damages under the FDCPA and M.C.L. § 339.916, and award damages under the Michigan Consumer Protection Act, for

each Plaintiff, actual damages or $250.00, whichever is greater, M.C.L. § 445.911(2), and for Plaintiff class members, actual damages and reimbursement, M.C.L. § 445.911(4), (5); and award damages under the Michigan Regulation of Collection Practices Act, actual damages or $50.00, whichever is greater, and a civil fine of not less than three times actual damages or $150.00, whichever is greater, for each violation, M.C.L. § 445.257(2);

d. Enter appropriate declaratory and injunctive relief, including under M.C.L. §§ 445.257(1) and 445.911(1);

e. Award attorney's fees and costs, see, e.g., 15 U.S.C. § 1692k(a)(3); M.C.L. §§ 339.916(2), 445.257(2), 445.911(2); and

f. Order other relief the Court deems just and equitable.

BUCHANAN FIRM
Attorneys for Plaintiffs

Date: November 12, 2026 BY: ______________________________
Robert J. Buchanan (P42006)

BUSINESS ADDRESS & TELEPHONE

452 Ada Dr. SE, Suite 300
Ada, MI 49301
(616) 458-2464